IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 31, 2013

**IN RE SHANDAJHA A. G.[1]**

**Appeal from the Chancery Court for Knox County**
**No. 182609-1    John F. Weaver, Chancellor**

_____

**No. E2012-02579-COA-R3-PT-FILED-JULY 17, 2013**

_____

This is a parental termination case. The child at issue was removed from the mother as a result of the mother's drug abuse. The trial court found clear and convincing evidence to support the grounds for termination of the mother's parental rights and clear and convincing evidence that such termination was in the child's best interest. The trial court further allowed the non-relative petitioners to adopt the child. The mother appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Robert Lewis Straight, III, Knoxville, Tennessee, for the appellant, Cassandra N. J.

Theodore Kern, Knoxville, Tennessee, for the appellees, Rebecca Ashley Means and Charles Howard Means.

**OPINION**

**I. BACKGROUND**

_____

[1]This court has a policy of protecting the identity of children in parental rights termination cases by initializing the last names of the parties.

Cassandra N. J. ("Mother") is the biological mother[2] of Shandajha A. G. ("the Child" or "Dajha"). The Child has two half siblings named Jada J. and Shannon B. (collectively with Shandajha A. G., "the Children"). The Children were in the custody of Mother until August 2011, at which time the Tennessee Department of Children Services ("DCS") removed them from Mother's home. Mother's brother, Cassen ("Uncle"), and his wife, Courtney ("Aunt") (collectively "the Relatives"), were informed by DCS that the Children were being taken from Mother due to drug issues. The Relatives were told that the Children would be placed in DCS custody if they did not agree to take them. Upon filing a petition for custody, the Relatives were granted physical custody of the Children on August 3, 2011. All three children were living together with the Relatives, who had four young children of their own.

Charles and Rebecca Means ("the Petitioners") are the owners of North Side Chiropractic in Knoxville. Dr. Means employed Aunt at North Side Chiropractic in April 2011, and the Relatives became friends with the Petitioners. Around November 2011 the Relatives began to allow Dajha to stay at the Petitioners' home for overnight visits one or two nights a week.

On December 26, 2011, the family gathered at the home of the Children's Grandmother. Present at this visit were Mother, Dajha, Shannon, Jada, Uncle, Grandmother, and Grandmother's husband. At the visit, Mother provided Christmas gifts for the Children.

A hearing was held on January 9, 2012, concerning the custody of Dajha and Shannon. Jada had been transferred to DCS custody earlier that month due to her anger management issues and the Relatives' inability to care for her. Dajha remained in the legal and physical custody of the Relatives until March 15, 2012, at which time custody was transferred to the Petitioners.

A petition for termination of parental rights and adoption was filed by the Petitioners concerning Dajha on April 3, 2012. The Petitioners asserted that Mother had abandoned Dajha as defined by Tennessee Code Annotated sections 36-1-113(g)(1) and 36-1-102 by willfully failing to make reasonable payments toward the support of the Child and by willfully failing to visit with her during the four months preceding the filing of the petition. Additionally, the Petitioners asserted that Mother's parental rights should be terminated under Tennessee Code Annotated section 36-1-113(g)(3) due to the fact that the conditions which led to Dajha's removal from Mother's home had persisted for six months prior to the date on which the petition was filed and that there was little likelihood that the conditions would be remedied at an early date so that the Child could be safely returned to Mother's

---

[2]The parental rights of the Child's father were terminated on June 25, 2012.

care in the future.  Lastly, the Petitioners asserted that it would be in Dajha's best interest for Mother's parental rights to be terminated.

In Mother's answer, filed pro se, she asserted the following: she had been attending a program to address the drug issues which led to the removal of Dajha; the Petitioners did not allow her regular contact with Dajha; she had not been employed during the four months prior to the petition due to the closing of the business where she worked; and she was not aware of a duty to pay child support because a court date had not been set concerning the issue.

On November 5, 2012, testimony was given by Aunt; Kendra Shackleford, a DCS family service worker; the Petitioners; Jackie Strickland, the foster parent for Jada and Shannon; and Mother.

Aunt testified that when the Children were at the Relatives' house, Mother did not try to speak directly with the Children and did not ask to see the Children at any time. According to Aunt, Mother only called to harass the Relatives.  Aunt observed that Mother did not follow up on recommendations of the family meeting held with DCS and that she did not provide any financial assistance for Dajha.  She noted that Mother threatened to kill the Relatives and their children if her parental rights were terminated.  Aunt testified that both she and Uncle would be willing to facilitate future contact between Dajha and her siblings.

Mrs. Means testified that there have been phone calls to Dajha from Mother.  She noted that Mother would ask the Child, "Do you want to come home with your mommy?  I'm your mom.  Do you want to come home with your mom?"  Dajha would respond, "I want to stay here with my mommy."  Mother then would ask, "Who's your mommy?"  Dajha would say, "Mommy Becca."  Mother immediately would start yelling at Dajha, telling her that Mrs. Means was not her mommy – that Mother was her mommy.  Mother would instruct Dajha that she should not want to be with Mrs. Means.  According to Mrs. Means, Mother has not had any actual visits with Dajha during the time custody has been with the Petitioners.  She recalled Mother asking about visitation once.  Mr. Means got the information about scheduling supervised visitation, but then Mother never requested it again.  The Petitioners both testified that they never told Mother she could not visit Dajha.  They described Mother as "defensive" and "disrespectful."

Mrs. Means related that Dajha had been accepted fully into their family.  She  stated that she and her husband were willing to maintain Dajha's relationships with her siblings, so long as doing so was not harmful to the Child.  She observed that they have facilitated contact between Dajha and both of her siblings by telephone calls and visits.  Mr. Means testified that he thinks it is very important for Dajha to stay in contact with her siblings and

that he was also willing to work with Jada and Shannon's current caretaker, Jackie Strickland, toward this goal.

Jackie Strickland stated that she was willing to work with the Petitioners to maintain contact between the Children. She reported that Mother speaks to Jada and Shannon often.

Kendra Shackleford testified that the Children initially came into DCS custody because Mother was using cocaine and/or crack cocaine and because she was resistant to treatment. According to Ms. Shackleford, Mother was subject to the parenting plan ("the Plan") developed for Jada and Shannon during the time that Dajha was in the custody of either the Relatives or the Petitioners. The Plan required Mother to have an alcohol and drug assessment and follow recommendations for treatment; obtain a mental health assessment and follow recommendations for treatment; obtain employment or a legal source of income; obtain and maintain suitable housing for herself and the Children; attend visitation with the Children; and complete parenting classes. Ms. Shackleford assisted Mother with completion of the Plan by providing referrals for alcohol and drug programs and for mental health assessment. Mother obtained housing and completed the parenting classes, but she did not complete drug or alcohol treatment and never provided any documentation that she had obtained the mental health assessment. Ms. Shackleford related that Mother never paid any support for the Children. She was aware of no disability or impairment that kept Mother from working.

Mother testified that she took steps to complete programs to address her drug abuse issues. She related that she enrolled in an outpatient drug treatment program with Helen Ross McNabb and attended it for three out of the four weeks. She admitted that she did not complete the program but claimed that she did not always have bus fare to get to class and was forced to miss because of multiple court hearings. Mother asserted that she completed a parenting class and obtained stable housing.

Mother claimed that she spoke with her children "every day" while they were in the Relatives' custody. Mother contended that while Dajha was in the custody of the Petitioners, she made constant efforts to maintain a relationship with the Child. She alleged that the Petitioners denied her access to the Child. Mother noted that she had difficulty visiting because she did not have consistent transportation. Mother acknowledged that she had been in jail for twenty-eight days, charged with theft, in October 2012. She testified that a drug screen would turn up positive for hydrocodone, a medication for which she did not have a prescription, because she took some the night before the hearing. She related that she had no job, no car, and no driver's license.

At the conclusion of proof, the trial court held as follows:

-4-

[T]he [c]ourt finds that the evidence is clear and convincing that there was a willful failure on the part of the mother to pay child support for four months prior to the filing of the petition, that the Christmas gifts are token support and do not suffice. And the [c]ourt believed the testimony of the [Relatives] . . . about the lack of support while [the Relatives] had the child in question in this case.

The [c]ourt also finds the evidence is clear and convincing that there is a persistence of conditions under 36-1-113(g)(3), and that the mother still has not completed a drug rehabilitation treatment program, and just last night she self-mediated, if the Court were to believe the testimony about the tooth. But the mother even testified that her tooth is not bothering her now.

The [c]ourt finds that there's clear and convincing evidence of illegal drug use, a drug not prescribed for her, just last night, a narcotic called hydrocodone.

As to best interest, the [c]ourt finds the evidence is clear and convincing that all of the statutory factors, with the exception of number eight, are in favor of being in the best interest of the child being with the [Petitioners], and that the mother's parental rights be terminated.

The [c]ourt finds that number eight does not apply to the case. There is no evidence one way or the other as to number eight.

The mother still has not completed a drug rehab program. And, again, she just took a half of a hydrocodone last night.

The child has bonded with the [Petitioners] and is happy and doing well. Their home is safe. The mother lost the child because of a drug abuse problem, and she still has not taken the necessary steps to resolve that problem.

So the [c]ourt will terminate the parental rights . . . .

The trial court held that the Petitioners had proved, by clear and convincing evidence, that grounds for termination of Mother's parental rights with respect to Dajha existed pursuant to Tennessee Code Annotated sections 36-1-11(g)(1) and 36-1-102, due to willful failure to provide support of the Child during the four months prior to the filing of the petition. The trial court further held, by clear and convincing evidence, that grounds for termination of Mother's parental rights existed pursuant to Tennessee Code Annotated section 36-1-113(g)(3) due to the fact that Mother's drug issues which led to the removal of the Child,

persisted for six months prior to the filing of the petition. Lastly, the trial court held that terminating Mother's parental rights was in the Child's best interest. Mother timely filed this appeal.

## II. ISSUES

The following issue was raised on appeal:

Whether the trial court erred when it found that it was in the best interest of the Child to have Mother's parental rights terminated.

## III. STANDARD OF REVIEW

Parents have a fundamental right to the care, custody, and control of their children. *Stanley v. Illinois*, 405 U.S. 645 (1972); *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988). This right "is among the oldest of the judicially recognized liberty interests protected by the Due Process Clauses of the federal and state constitutions." *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004). "Termination of a person's rights as a parent is a grave and final decision, irrevocably altering the lives of the parent and child involved and 'severing forever all legal rights and obligations' of the parent." *Means v. Ashby*, 130 S.W.3d 48, 54 (Tenn. Ct. App. 2003) (quoting Tenn. Code Ann. § 36-1-113(I)(1)). "'[F]ew consequences of judicial action are so grave as the severance of natural family ties.'" *M.L.B. v. S.L.J.*, 519 U.S. 102, 119 (1996) (quoting *Santosky v. Kramer*, 455 U.S. 745, 787 (1982)).

While parental rights are superior to the claims of other persons and the government, they are not absolute and may be terminated upon appropriate statutory grounds. *See Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002). Due process requires clear and convincing evidence of the existence of the grounds for termination of the parent-child relationship. *In re Drinnon*, 776 S.W.2d at 97. "[A] court must determine that clear and convincing evidence proves not only that statutory grounds exist [for termination] but also that termination is in the child's best interest." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The existence of at least one statutory basis for termination of parental rights will support the trial court's decision to terminate those rights. *In re C.W.W.*, 37 S.W.3d 467, 473 (Tenn. Ct. App. 2000), abrogated on other grounds by *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005).

The heightened burden of proof in parental rights termination cases minimizes the risk of erroneous decisions. *In re C.W.W.*, 37 S.W.3d at 474; *In re M.W.A., Jr.*, 980 S.W.2d 620,

622 (Tenn. Ct. App. 1998). Evidence satisfying the clear and convincing evidence standard establishes that the truth of the facts asserted is highly probable. *State v. Demarr*, No. M2002-02603-COA-R3-JV, 2003 WL 21946726, at *9 (Tenn. Ct. App. Aug. 13, 2003). This evidence also eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *In re S.M.*, 149 S.W.3d 632, 639 (Tenn. Ct. App. 2004); *In re J.J.C.*, 148 S.W.3d 919, 925 (Tenn. Ct. App. 2004). It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001); *In re C.W.W.*, 37 S.W.3d at 474.

The Tennessee Supreme Court has provided guidance in reviewing cases involving the termination of parental rights:

> A reviewing court must review the trial court's findings of fact de novo with a presumption of correctness under [Rule 13(d) of the Tennessee Rules of Appellate Procedure]. *See In re Adoption of A.M.H.*, 215 S.W.3d [793,] 809 [(Tenn. 2007)]. In light of the heightened burden of proof in proceedings under [Tennessee Code Annotated section] 36-1-113, *the reviewing court must then make its own determination regarding whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, provide clear and convincing evidence that supports all the elements of the termination claim.* State Dep't of Children's Servs. v. Mims, 285 S.W.3d [435,] 447-48 [(Tenn. Ct. App. 2008)]; *In re Giorgianna H.*, 205 S.W.3d 508, 516 (Tenn. Ct. App. 2006); *In re S.M.*, 149 S.W.3d 632, 640 n. 13 (Tenn. Ct. App. 2004). Appellate courts conduct a de novo review of the trial court's decisions regarding questions of law in termination proceedings. However, these decisions, unlike the trial court's findings of fact, are not presumed to be correct. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010) ]; *In re Adoption of A.M.H.*, 215 S.W.3d at 809.

*In re Bernard T.*, 319 S.W.3d 586, 596-97 (Tenn. 2010) (emphasis added).


## IV. DISCUSSION

Tennessee Code Annotated section 36-1-113 provides the grounds for termination of parental rights. The applicable provisions read as follows:

> **36-1-113. Termination of parental rights.** – (a) The chancery and circuit courts shall have concurrent jurisdiction with the juvenile court to terminate

parental or guardianship rights to a child in a separate proceeding, or as a part of any grounds for termination of parental or guardianship rights permitted in this part or in title 37, chapter 1, part 1 and title 37, chapter 2, part 4.

(b)  The prospective adoptive parent . . . shall have standing to file a petition . . . to request termination of parental or guardianship rights . . . .

(c) Termination of parental or guardianship rights must be based upon:

> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

* * *

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). . . :

> (1)  Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

> (2)  There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4;

> (3)  The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

>> (A)  The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

>> (B)  There is little likelihood that these conditions will be remedied at an early date so that the child

-8-

can be safely returned to the parent(s) or
guardian(s) in the near future; and

(C) The continuation of the parent or guardian
and child relationship greatly diminishes the
child's chances of early integration into a safe,
stable and permanent home . . . .

Tenn. Code Ann. §§ 36-1-113(a) - (g)(3)(A)-(C). The party petitioning for termination
carries the burden of proof. *In re M.J.B.*, 140 S.W.3d 643, 653 (Tenn. Ct. App. 2004). The
requirements ensure that each parent receives the constitutionally required "individualized
determination that a parent is either unfit or will cause substantial harm to his or her child
before the fundamental right to the care and custody of the child can be taken away." *In re
Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

### WILLFUL FAILURE TO SUPPORT

Pursuant to Tennessee Code Annotated section 36-1-102(1)(A) and Tennessee Code
Annotated section 36-1-102(1)(D), it is alleged Mother abandoned the Child by willfully
failing to support and willfully failing to make reasonable payments toward the Child's
support. It is alleged that any support or payments that have been made constitute token
support as defined in Tennessee Code Annotated section 36-1-102(1)(B).

Mother claims that the record does not contain clear and convincing evidence that she
knew of her duty to support, had the ability to provide support, made no attempts to support,
and did not have a justifiable excuse for not providing any support. She asserts there was no
proof that she was informed of her obligation to pay child support. Mother further contends
that during the relevant four-month time period, there is no proof that she had the ability or
means to provide child support. According to Mother, during that time frame, she did not
have a job and did not have reliable transportation. She also argues there is no proof that
during the relevant period she intentionally did not obtain employment.

In *In re Audrey S.*, 182 S.W.3d 838 (Tenn. Ct. App. 2005), we addressed the concept
of "willfulness":

The concept of "willfulness" is at the core of the statutory definition of
abandonment. A parent cannot be found to have abandoned a child under
Tenn. Code Ann. § 36-1-102(1)(A)(i) unless the parent has either "willfully"
failed to visit or "willfully" failed to support the child for a period of four

-9-

consecutive months. . . .

> In the statutes governing the termination of parental rights, "willfulness" does not require the same standard of culpability as is required by the penal code. Nor does it require malevolence or ill will. Willful conduct consists of acts or failures to act that are intentional or voluntary rather than accidental or inadvertent. Conduct is "willful" if it is the product of free will rather than coercion. Thus, a person acts "willfully" if he or she is a free agent, knows what he or she is doing, and intends to do what he or she is doing.

> Failure to visit or support a child is "willful" when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so. Failure to visit or to support is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty, or amounts to a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. The parental duty of visitation is separate and distinct from the parental duty of support. Thus, attempts by others to frustrate or impede a parent's visitation do not provide justification for the parent's failure to support the child financially.

> The willfulness of particular conduct depends upon the actor's intent. Intent is seldom capable of direct proof, and triers-of-fact lack the ability to peer into a person's mind to assess intentions or motivations. Accordingly, triers-of-fact must inter intent from the circumstantial evidence, including a person's actions or conduct.

182 S.W.3d at 863-64 (internal citations omitted). Our opinion in *In re M.J.B.*, 140 S.W.3d 643, lays out a test for failure to support:

> (1) that the parent is aware of his or her duty to support; (2) that the parent is able to provide financial support, either through income from employment or qualification for government benefits; and (3) that the parent has voluntarily and intentionally chosen not to provide financial support without a justifiable excuse.

*In re M.J.B.*, 140 S.W.3d at 654.

The law in this state is clear that a parent has a duty to support a child, regardless of whether there is a prior court order requiring such. *In re M.A.C*, No. M2007-01981-COA-

R3-PT, 2008 WL 2787763, at *5 (Tenn. Ct. App. July 17, 2008); Tenn. Code Ann. § 36-1-102(1)(H). Thus, the absence of the court order to pay support does not justify Mother's actions. Mother has advanced no valid reason why she is not working. Her testimony that a male individual had been giving her money for purely charitable purposes strains credulity. She acknowledged that she lives on a bus route and could utilize it to obtain employment to better herself. The Petitioners have established that Mother made no attempt to pay support and lacked a justifiable excuse for failing to do so. The evidence clearly and convincingly supports the trial court's holding that Mother's failure to support was willful. This ground for termination is affirmed.

## WILLFUL FAILURE TO VISIT

It is alleged that Mother abandoned the Child pursuant to Tennessee Code Annotated section 36-1-102(1)(A). That provision provides that if a respondent has willfully failed to maintain contact with the minor child for a period of four consecutive months or more immediately preceding the filing of the petition to terminate and if any visitation that respondent may have had with the minor child has been merely token visitation as defined in Tennessee Code Annotated section 36-1-102(1)(C), then the respondent's rights to parent the minor child may be terminated. "Failure to visit or support a child is 'willful' when a person is aware of his or her duty to visit or support, has the capacity to do so, makes no attempt to do so, and has no justifiable excuse for not doing so." *In re M.J.B.*, 140 S.W.3d at 654.

The record reveals that during the statutory four-month period, Mother saw the Child one time at Christmas. Failure to visit is not excused by another person's conduct unless the conduct actually prevents the person with the obligation from performing his or her duty or constitutes a significant restraint of or interference with the parent's efforts to support or develop a relationship with the child. *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009). Mother presented no evidence that the Relatives or the Petitioners had done anything to hinder Mother from visiting Dajha. In this case, the evidence clearly and convincingly supports the trial court's holding that Mother's failure to visit was willful.

## PERSISTENT CONDITIONS

Another ground alleged is persistent conditions, which is defined as follows:

The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

-11-

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home;

Tenn. Code Ann. § 36-1-113(g)(3)(A-C).

Mother testified at the hearing that she used hydrocodone the night before the hearing. Mother had no prescription for this narcotic. Accordingly, the evidence of record supports the conclusion that Mother is continuing to abuse drugs - engaging in the same behavior that led to the removal of the Children from her custody. Further, Mother never completed drug and alcohol treatment and provided no documentation that she had obtained a mental health assessment. Thus, the record before us supports the trial court's determination that the same conditions in existence when the Child left Mother's custody persist to this day.

## B. BEST INTEREST

Having concluded that there was clear and convincing evidence supporting the statutory grounds to terminate Mother's parental rights, we must consider whether termination of Mother's parental rights was in the best interest of Dajha. In making this determination, we are guided by the non-exhaustive list of factors provided in Tennessee Code Annotated section 36-1-113:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child . . . the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or

-12-

guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to [section] 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (2010). "This list is not exhaustive, and the statute does not require a trial court to find the existence of each enumerated factor before it may conclude

that terminating a parent's parental rights is in the best interest of a child." *In re M.A.R.*, 183 S.W.3d 652, 667 (Tenn. Ct. App. 2005). The General Assembly has also stated that "when the best interest[] of the child and those of the adults are in conflict, such conflict shall always be resolved to favor the rights and the best interest[ ] of the child, which interests are hereby recognized as constitutionally protected." Tenn. Code Ann. § 36-1-101(d); *see also White v. Moody*, 171 S.W.3d 187, 194 (Tenn. Ct. App. 2004) (holding that when considering a child's best interest, the court must take the child's perspective, rather than the parent's).

The proof clearly reveals that termination of Mother's parental rights was in the Child's best interest. Mother failed to complete a drug treatment program, spent time incarcerated while the termination petition was pending, and even admitted to using a drug not prescribed for her the night before the hearing. She has neither visited the Child nor provided any support for her. No meaningful relationship exists between Mother and the Child – Dajha views Mrs. Means as her mother and calls her "Mommy." The Child has become attached to the Petitioners and has become fully integrated into their family. The Petitioners home is healthy and safe. While Mother argues that Jada and Shannon have been harmed by separating them from their sister, the focus of the court must be on what is in the best interest of the Child before us, Dajha.

In consideration of all of the foregoing factors, the trial court correctly concluded that the termination of Mother's parental rights is in the best interests of the Child.

## V. CONCLUSION

We affirm the trial court's order terminating the parental rights of Mother to Shandajha. A. G. The costs of the appeal are taxed to Mother, Cassandra N. J.

_____
JOHN W. McCLARTY, JUDGE

-14-